UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :

       v.             :      Docket No. 3:12CR97(EBB)

MICHAEL THOMPSON          :

RULING ON MOTION TO SUPPRESS

On May 10, 2012, a grand jury returned a seven-count indictment charging the defendant, Michael Thompson ("Thompson"), and numerous others with various drug offenses. Thompson was charged in count one with conspiracy to possess with intent to distribute, and to distribute, 500 grams or more of cocaine, 28 grams or more of cocaine base, 100 kilograms or more of marijuana and a quantity of oxycodone, in violation of 21 U.S.C. § § 841(a)(1), 841(b)(1)(B), 841(b)(1)(c) and 846.

Thompson has moved to suppress two digital scales and $2,000 in U.S. currency that was seized from his residence following his arrest on May 22, 2012. Thompson asserts that, although he gave oral and written consent to a warrantless search of his residence after he was arrested, the fruits of the search must be suppressed because his consent was coerced by an officer's threat to arrest his sister and girlfriend.[1]

---

[1] In his motion to suppress, which was filed five months after his arrest, Thompson asserted that his consent to search was not voluntary because he "was of an exhausted mental state and incapable of fully understanding the request by law enforcement to search his premises" and that "[h]is diminished mental state was sufficient to preclude him from intelligently consenting to the search request." He argued that the Court should consider "the shock and high emotional influence accompanying his arrest" when considering whether his consent was valid. Notably, that motion, which Thompson affirmed was accurate with the exception of a few minor facts, did not mention or assert the claim that his consent to search was the result of coercion in the form of a threat to arrest his sister and girlfriend. The first time Thompson raised this claim was in his direct testimony at the suppression hearing, which was held nine months after his

For the following reasons, Thompson's motion [doc. # 272] is DENIED.

*STANDARD OF REVIEW*

In cases where the government relies on consent to justify a warrantless search, it bears the burden of demonstrating that consent was given freely and voluntarily. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). To be valid, consent to search does not have to be intelligent and knowing. Id. at 237 (noting that defendant's knowledge of the right to refuse consent is not a prerequisite of a voluntary consent). The voluntariness of consent is a question of fact that is determined from the totality of the circumstances. In making this decision, courts must balance two competing concerns – the legitimate needs of law enforcement, and the "equally important requirement of assuring the absence of coercion." Id. at 227. The factors to consider in determining whether consent was valid are (1) the defendant's age, (2) his educational background, (3) the defendant's level of intelligence, (4) whether the defendant was advised of his constitutional rights, (5) the length of detention, (6) the nature of the questioning, (7) the use of physical force, (8) whether guns were drawn, (9) whether the defendant was threatened, (10) whether the defendant was in a public area and (11) whether the defendant knew he had the option to refuse consent. The ultimate question is "whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (quoting United States v. Sanchez, 32 F.3d 1330, 1334-35 (8th Cir. 1994)).

As the Second Circuit has ruled, neither coercion inherent in the fact of arrest, nor a representation that a warrant would be sought if consent were withheld, nor the fact that the

_____

motion was filed. At that hearing, Thompson withdrew all the claims he had made when he initially filed the motion to suppress..

defendant was handcuffed suffices to establish coercion. United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990); United States v. Faruolo, 506 F.2d 490, 494-95 (2d Cir. 1974) (holding that agent's advice to defendant that absent his consent to search, a warrant could be obtained does not constitute coercion). Other factors that tend against a finding of coercion are whether the defendant was given Miranda warnings prior to being asked for consent and the defendant's familiarity with law enforcement and the criminal justice system. Kon Yu-Leung, 910 F.3d at 41.

*FACTS*

The Court held a suppression hearing on June 25, 2013. Two of the officers who effectuated Thompson's arrest and the search of his apartment, officers David Rivera ("Rivera") and Steven Silk ("Silk"), both New Haven police officers assigned to the DEA task force, testified. Thompson also testified. Based on the credible and corroborated[2] testimony of the two officers, the Court finds the following facts to be established. The Court does not credit Thompson's self-serving, uncorroborated testimony, which is, among other things, directly controverted by the unequivocal representations he made in his signed consent to search form.

At approximately 5:10 a.m. on May 22, 2012, as part of a large federal round-up, Rivera and four other law-enforcement officers arrived at Thompson's second-floor apartment in New Haven, Connecticut to execute a federal warrant for his arrest. Rivera's first knock on the apartment door was not answered. He knocked again, identified himself and the other officers as police, and shouted "open up." A male voice on the other side of the door responded by saying "hold on" and the speaker walked away from the door. After confirming that they had the correct

---

[2]Except for a few minor details, the testimony of the two officers was consistent.

apartment, Rivera banged on the door and shouted that, if it was not opened immediately, it would be taken down. The male, whom Rivera immediately identified as Thompson, opened the door and the officers entered, with guns drawn, directly into the apartment living room. Approximately four minutes elapsed from the first knock to the officers' entry.

Upon entering, Rivera secured Thompson and placed him in handcuffs without incident. Thompson was calm and alert. The officers then conducted a protective sweep of the small apartment, during which they located two adult females: Thompson's girlfriend, who was found in Thompson's bedroom, and his sister, who was found in another bedroom. Both women were taken to a small room adjacent to the living room where they remained the entire time the officers were in the apartment. Thompson remained seated and handcuffed in the living room. Between five and ten minutes passed from the time the officers entered the apartment and the time the protective sweep was finished. After the protective sweep was completed, Rivera arrested Thompson and advised him of his rights. At that point, the officers holstered their guns and they remained holstered for the remainder of the time they were in the apartment.

Rivera then asked Thompson if he would be willing to give his consent to a search of his apartment. When Thompson refused, Rivera told him that they were going to seek a search warrant and, if they got one and found narcotics or other contraband, then anyone else in the apartment could be arrested. Rivera then called the DEA resident agent-in-charge ("RAC") to see if they had probable cause for a search warrant based on the fact that, during the protective sweep, they had observed, in plain view in Thompson's bedroom, a small baggie containing a plant-like residue that they thought could be marijuana. The RAC said he would check with the AUSA and call back after the AUSA determined whether that was sufficient for a warrant.

Rivera explained to Thompson that they had to wait for a call back from the RAC about the search warrant and that they were not sure they could get one.

While they waited, none of the officers engaged Thompson in conversation, questioned or threatened him. They did not ask him again for his consent to search. After about twenty to twenty-five minutes of waiting, Thompson, without any prompting, said he would give his consent to a search of the apartment. Rivera then produced a DEA consent to search form which he read to Thompson before handing it to him. After Thompson read the consent form, he signed and dated it. The following advice was printed directly above the form's signature line: "I have not been threatened nor forced in any way [and] I freely consent to the search." Rivera and Silk observed Thompson read and sign the consent form and they signed it as witnesses.

The officers then conducted a search of the apartment. They recovered two digital scales on top of the kitchen cabinets and $2,000 in U.S. currency that was found in a small, opened safe inside the pantry. The search concluded at approximately 7:10 a.m., at which time the officers transported Thompson for processing. The two women were released inside the apartment; no action was taken against either of them.

During the time between his arrest and his consent to search, Thompson did not ask to speak to his girlfriend or sister, did not ask to speak to an attorney or anyone else, and did not cry, yell or become angry. He remained seated and handcuffed the entire time, except for the short time it took him to read and sign the consent to search form.

The evidence also established that Thompson was 34 years old at the time of his arrest, had completed the eleventh grade and had significant experience with the criminal justice system and interacting with police officers. In the prior 15 to 17 years he had seven state felony drug

convictions and at least seven other arrests, two of which also resulted in felony convictions. At the time Thompson consented to the search he was calm, aware of what was going on, did not appear to be under the influence of drugs or alcohol, and was well aware of his constitutional rights, including his right to refuse to consent to search.

With two exceptions, Thompson's account of the events was consistent with the officers' account. However, in contrast to the officers' testimony, Thompson's testimony on the issue of his consent was equivocal, inconsistent and contradictory. On direct examination by his attorney, Thompson testified that after he refused to consent to a search of his apartment one of the officers told him that, if they had to get a search warrant and then found any contraband in the apartment, they "was [sic] going to take" his sister and girlfriend "to jail." Significantly, Thompson did not say that Rivera told him that the women would be arrested if he refused to give his consent. It was only in response to his attorney' next question, which was leading and mischaracterized what Thompson had just said, that Thompson agreed that Rivera threatened to arrest his sister and girlfriend if he refused to consent to a search.

Specifically, the following colloquy ensued between Thompson and his attorney:

Q. You just said you were asked, the police officers asked you if they could search your home, right?
A. Yes.
Q. And what did you tell them?
A. No.
Q. You said no?
A. Yes.
Q. And they told you, didn't they, that if you didn't give them voluntary consent, they would have to get a search warrant, right?
A. Yes.
Q. So when you told them no, what did the officers do?
A. They got on the phone, they threatened me with - - they said if they search [sic] the house and they found anything, they was going to take my sister and my girlfriend at the time to

6

jail.  Like any contraband that would be found in the house.

Q.  Okay.  So they told you they would be taking your sister and your girlfriend to jail unless you agreed to a voluntary search, is that your testimony?"

A.  Yes.

Q.  And what did you say then?

A.  Then I agreed to the search.

Q.  Okay.  And you agreed to the search, and did you feel threatened at that time?

A.  Yes.

Q.  All right.  And how did you feel threatened.

A.  Because I thought they was going to take, take it out on my sister and my girlfriend at the time for something that I did.

On cross-examination, Thompson contradicted his direct testimony with regard to the amount of time that elapsed between his initial refusal to provide consent to search and his later, spontaneous consent as well as the number of times the officers asked for his consent.  In contrast to his direct testimony, Thompson's testimony on cross-examination confirms that he did not give his consent immediately after Rivera made the alleged threat to jail his sister and girlfriend if drugs were found, but that approximately twenty to twenty-five minutes elapsed between his initial refusal and the time he consented.  Thompson also changed his testimony with regard to the number of times the officers asked if he would consent.  On direct, his testimony was that the officer asked for his consent once, but on cross he testified that he was asked for his consent four times, in five minute intervals, until he finally consented after the fourth request.

Thompson's conflicting testimony on this central issue cannot be credited.

## _DISCUSSION_

According to the government, the totality of the evidence relating to Thompson's arrest and subsequent consent to search establishes that the arresting officers reasonably believed that Thompson's oral and written consent to search his residence was given freely and voluntarily.

Thompson maintains that his consent was not voluntary because he was coerced by Rivera's

threat to put his sister and girlfriend in jail if narcotics were found in the apartment.[3]  The Court finds Thompson's claim to be without merit.  Based on the totality of the circumstances, the Court finds that Thompson's consent to search his apartment was freely and voluntarily given.

Thompson's personal characteristics weigh in favor of finding his consent was voluntary.  United States v. Puglisi, 790 F.2d 240, 243-44 (2d Cir. 1986).  Thompson was 34 years old, educated and very familiar with law enforcement.  He was not agitated or confused and was not under the influence of drugs or alcohol at the time he consented.

The atmosphere in the apartment at the time Thompson gave his consent was not threatening.  Rather, it was given after relative calm had been restored.  See United States v. Zaleski, 559 F. Supp. 2d 178, 186-87 (D. Conn. 2008).  As such it was "more conducive to the making [of] a knowing and intelligent decision," United States v. Mapp, 476 F.2d 67, 78 (2d Cir. 1973), than the atmosphere that existed at the time he refused to consent.  Although Rivera told Thompson that they would seek to obtain a warrant if he withheld consent, that is not sufficient to establish coercion.  United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983); Faruolo, 506 F.2d at 494-95.  The same is true with regard to the facts that the officers entered the apartment with their guns drawn, handcuffed Thompson and kept him handcuffed the entire time.  Kon Yu-Leung, 910 F.2d at 41.  The only time the officers made any show of force was when they entered and secured the apartment.  Further, Thompson was only asked one time for his consent, and that request was made at the time Rivera arrested him.  During the approximate

---

[3]In his post-hearing memorandum in support of his motion to suppress, Thompson does not claim that Rivera threatened to arrest the women if he did not consent to the search.  Thompson only claims that he "was told that if they had to get a warrant, anyone else in the apartment would also be arrested if contraband was located there."  As discussed infra, the difference is significant.

twenty to twenty-five minute period that followed his arrest and refusal to consent, while they waited for word on obtaining a warrant, calm had been restored. In that interval, Thompson was not interrogated, was not threatened or subjected to physical force of any kind, was not tricked or deceived, was well aware of his right to refuse consent and knew what was happening, including that the officers were not certain that they could obtain a search warrant. See United States v. Ceballos, 812 F.2d 42, 51 (2d Cir. 1987). Thompson ultimately changed his mind and orally gave his consent to search without being prompted and then gave his written consent after reading and signing the consent to search form and acknowledging that his consent was freely given and that he had not been threatened or forced to do so. Further, the lack of temporal proximity between the time Rivera raised the possibility that the women could be arrested if circumstances warranted and the time Thompson consented to the search twenty to twenty-five minutes later, underscores the voluntary nature of Thompson's consent. United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006). Thus, while everyone waited for word about the search warrant, Thompson had time for thoughtful reflection which permitted him to make a free and voluntary decision to give his consent. In fact, the atmosphere in which he gave his consent was far from that "which would overwhelm the frightened prisoner and vitiate consent." United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988). Under these circumstances, it cannot be said that Thompson changed his mind and consented to the search as a result of duress or in acquiescence to a claim of lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

The single circumstance Thompson alleges in support of suppression is that his consent was coerced by the officer's alleged "threat" "to take" his girlfriend and sister "to jail." Not only

is it a rare case in which a single coercive element, standing alone, is found sufficient to invalidate consent, <u>Kon Yu-Leung</u>, 910 F.2d at 41, the credible and uncontradicted testimony supports the conclusion that Thompson's consent was not the product of a threat or coercion.  In this regard, the Court does not credit Thompson's self-serving, contradictory, uncorroborated and newly asserted claim that the officers coerced his consent by threatening to arrest his sister and girlfriend.  Rather, the Court credits the testimony of Rivera and Silk, both of whom said that Rivera, after learning that the women were in the apartment, advised Thompson that they could also be arrested if contraband or narcotics were found in the apartment.  He did not threaten to actually arrest them.  He merely raised the possibility that they could be arrested  if circumstances warranted – and, as Rivera said, the circumstance that could warrant their arrest was finding narcotics, not Thompson's refusal to consent.  <u>Cf.</u> <u>Faruolo</u>, 509 F.2d at 497 (noting that the validity of consent may turn on the wording used by the agent and those words ought to be chosen with care).  Rivera chose his words with care and the difference between what he said and what he did not say is significant and dispositive.  <u>Compare</u> <u>United States v. Guzman</u>, 724 F. Supp. 2d 434, 443 (S.D.N.Y. 2010) (finding officer's statement that he would actually arrest and charge all of the apartment's occupants if defendant did not consent to a search of the premises was sufficiently coercive to vitiate consent) <u>with</u> <u>United States v. Perez</u>, 198 F. Supp. 2d 406, 414-15 (S.D.N.Y. 2002) (finding non-coercive officer's statement that whoever was in the apartment, impliedly referring to defendant's mother and fourteen year old daughter, could go to jail if drugs were found).

  As previously noted, the Court does not credit Thompson's affirmative response to his attorney's question that mischaracterized his prior testimony as to what Rivera said.  Not only did

Thompson's terse "yes" in response to his attorney's leading question contradict what he had just said, it also contradicts the credible and corroborated testimony of Rivera and Silk, and their testimony compels the Court to conclude that Rivera's statement was not a threat, was not coercive and did not vitiate Thompson's later, unprompted voluntary consent.  The totality of the circumstances establishes that Thompson's consent to search the apartment "was the product of an essentially free and unconstrained choice. . . ."  Arango-Correa, 851 F.2d at 57.

_CONCLUSION_

For the foregoing reasons, Thompson's motion to suppress [doc. # 272] is DENIED.

SO ORDERED.

/s/_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this 17th day of September, 2013.